**FEDERAL MEDIATION AND CONCILIATION SERVICE**
---------------------------------------------------------------------------x
In the Matter of the Arbitration between:

**INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS ("IBEW"), LOCAL 1362,**
("Union"),

<div align="right">

**OPINION and AWARD**

**FMCS Case No. 17-52401-8**

</div>

-and-

**ROCKWELL COLLINS, INC.**,
("Company", "Employer", or "Management").
---------------------------------------------------------------------------x

BEFORE:   Robert A. Grey, Esq., Arbitrator

HEARING DATE: September 6, 2017 at Kirkwood Training and Outreach Services,
       Hiawatha, Iowa

APPEARANCES:

  FOR THE UNION:

    Rush & Nicholson, PLC
    By: Nathan Willems, Esq.

  FOR THE COMPANY:

    Bradley & Riley, PC
    By: Kelly R. Baier, Esq.

<div align="center">

**INTRODUCTION**

</div>

Pursuant to the terms of the parties' Collective Bargaining Agreement ("CBA"),

the undersigned Arbitrator was selected by the parties and appointed by the Federal

Mediation and Conciliation Service ("FMCS") to hear and decide this grievance. The

arbitrability of this grievance is not in dispute.

On December 6, 2016, after approximately two months of meetings, discussions

and correspondence with Union leadership, the Company announced its decision to

outsource to an independent contractor all of the custodial work at its plant in Cedar Rapids, Iowa. This resulted in the displacement of all bargaining unit custodial job codes/classifications, and the permanent layoff of some bargaining unit custodial employees. The Union promptly filed a grievance alleging violation of the CBA, leading to this arbitration. The Company maintains it acted reasonably and in good faith with respect to outsourcing the custodial work, and that it fully complied with the CBA. The Union seeks restoration of the bargaining unit custodial work and employees, with a make-whole remedy. The Company seeks denial of the grievance.

## BACKGROUND

The hearing of this grievance was held pursuant to the parties' CBA on September 6, 2017. Both parties appeared by counsel and were afforded full, fair and ample opportunity to present and challenge evidence, examine and cross-examine witnesses, and argue their positions. All testimony was given under oath or affirmation and direct observation of the Arbitrator. The proceedings were transcribed by a court reporter and an official transcript was produced.[1] Neither party questioned the fairness of the proceedings. The record was closed upon receipt of the parties' post-hearing briefs.

This Opinion and Award is based upon detailed and thorough review and analysis of the entire record, including the Arbitrator's assessment of witness credibility, conflicting testimony, and the relative probative value of all evidence in the

---

[1]     Transcript page number citations are prefixed with "T".

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 2 of 49

record. All testimony, exhibits, and party positions have been considered in rendering this Opinion and Award, whether or not specifically addressed herein.

## STIPULATED ISSUES

The parties stipulated to the following issues:

**Did the Company violate the Collective Bargaining Agreement when it unilaterally outsourced Custodians [Classification 725] and Lead Custodians [Classification 727] on or about December 6, 2016?**

**If so, what shall be the remedy?**

## RELEVANT PARTY-CITED CBA PROVISIONS
(in order of appearance in the CBA)

**1. THIS AGREEMENT**, entered into this 4th day of May, 2013 by and between Rockwell Collins, Inc., Cedar Rapids, Iowa, a corporation organized under the laws of the State of Delaware, its assigns, successors, or firms who may be later acquired by it, hereinafter designated, as the "COMPANY", and Local Union No. 1362 of the International Brotherhood of Electrical Workers, affiliated with the A.F.L. - CIO - C.F.L., hereinafter designated as the "UNION", for and in behalf of the employees now employed and hereinafter employed by the COMPANY, at the Cedar Rapids location, within the unit of representation as hereinafter described, and designated collectively herein as the "employees" and singularly as "employee".

WHEREAS: The above-named UNION was on August 18, 1943 duly certified by the National Labor Relations Board (Case No. R-5571) as the representative for the purposes of collective bargaining, of all said employees.

WITNESS: WHEREAS, the parties hereto desire to establish a standard of conditions under which the employees shall work for the COMPANY during the term of this agreement and to provide for rates of pay, hours of work, and other conditions of employment for such employees to the end that their mutual relations may be negotiated with the view of securing harmonious cooperation, and to provide a procedure for a prompt and equitable adjustment of all grievances and disputes that may arise during the term of this agreement.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 3 of 49

NOW THEREFORE, in consideration of the mutual promises and agreements herein contained, the parties hereto agree as follows:

The COMPANY agrees to notify the UNION Business Manager of any proposed sale, conveyance, assignment, transfer, consolidation or merger of the COMPANY'S operations covered by this Agreement and to provide information about the sale conveyance, assignment, transfer, consolidation or merger, as required by the COMPANY'S bargaining obligations under the National Labor Relations Act. Such notification will be at the earliest possible time, consistent with sound business judgment of the COMPANY.

CBA p. 1.

## ARTICLE I
## MUTUAL COOPERATION AND COLLECTIVE BARGAINING

**2. Section 1 Cooperation.** The COMPANY and the UNION shall cooperate with each other to promote the welfare of the industry and the efficiency of the factory operations of the COMPANY. This agreement shall be binding upon the COMPANY and the UNION and upon all employees within the bargaining unit represented by the UNION as hereinafter defined.

**3. Section 2 Unit of Representation - Recognition of UNION.** The COMPANY hereby recognizes the UNION as the sole and exclusive bargaining agency for all employees within the unit of representation defined as follows: All production and maintenance employees including line stockmen, tool crib attendants, tool makers, assembly fixture makers, test technicians, model shop employees, custodial employees, and production and maintenance supervisory employees below the rank of Foreman, but excluding production clerks and expediters, office and clerical employees, guards, laboratory employees, engineers, draftsmen, and all supervisory employees classified as Foreman or higher in rank.

**4. Section 3 Rights of Management Reserved to COMPANY.** The management of the COMPANY'S property and operations, and the direction of the working forces, including the right to employ, promote, discipline in the interest of good service, and to discharge employees for proper cause is reserved to the COMPANY, subject however, to such limitations as are contained in this agreement.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 4 of 49

CBA p. 2.

<div align="center">* * *</div>

## 109. SCHEDULE OF WAGE RATES FOR EMPLOYEES HIRED PRIOR TO 5/4/2013

As established by contract between Rockwell Collins, Inc. and Local Union No. 1362 of the International Brotherhood of Electrical Workers, the below noted Schedule of Wages shall be implemented effective May 4, 2013.

| EFFECTIVE MAY 2016 | | | | | |
|---|---|---|---|---|---|
| LABOR GRADE | BASE RATE | AFTER 13 WEEKS | AFTER 26 WEEKS | AFTER 39 WEEKS | AFTER 52 WEEKS |
| 1 | 21.71 | 21.98 | 22.27 | -- | -- |
| 2 | 22.27 | 22.63 | 22.95 | -- | -- |
| 3 | 22.95 | 23.37 | 23.70 | 23.89 | -- |
| 4 | 23.89 | 24.35 | 24.71 | 25.04 | -- |
| 5 | 25.04 | 25.71 | 26.07 | 26.48 | -- |
| 6 | 26.48 | 27.23 | 27.66 | 28.16 | -- |
| 7 | 28.16 | 28.82 | 29.26 | 29.79 | -- |
| 8 | 29.79 | 30.31 | 30.75 | 31.04 | 31.50 |
| 9 | 31.50 | 31.91 | 32.20 | 32.51 | 32.70 |
| 10 | 32.70 | 33.17 | 33.47 | 33.78 | 34.00 |

CBA pp. 61-62. ["EFFECTIVE MAY 2014", "2015" and "2017" tables omitted for brevity, while noting that each contains separate rows with rates for Labor Grades 1 through 10, inclusive.]

<div align="center">* * *</div>

## 110-A . ALTERNATE RATE STRUCTURE (ARS) [content omitted for brevity]

<div align="center">* * *</div>

[Remainder of this page is intentionally blank, to keep following table on one page]

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 5 of 49

**110-B.** PAY SCALE FOR EMPLOYEES HIRED AFTER
5/4/2013

| EFFECTIVE MAY 2016 | | | | | |
|---|---|---|---|---|---|
| LABOR GRADE | BASE RATE | AFTER 6 MONTHS | AFTER 12 MONTHS | AFTER 18 MONTHS | AFTER 24 MONTHS |
| 1 | 14.25 | 16.75 | 18.75 | 19.00 | -- |
| 2 | 14.50 | 17.25 | 19.00 | 19.50 | -- |
| 3 | 15.00 | 17.75 | 19.50 | 20.25 | 20.50 |
| 4 | 16.00 | 18.25 | 20.50 | 21.00 | 21.25 |
| 5 | 17.00 | 19.00 | 21.25 | 22.00 | 22.50 |
| 6 | 17.75 | 20.25 | 22.50 | 23.50 | 24.00 |
| 7 | 18.75 | 21.25 | 23.75 | 24.75 | 25.00 |
| 8 | 19.75 | 22.25 | 25.00 | 26.25 | 27.00 |
| 9 | 20.75 | 23.50 | 27.00 | 27.50 | 28.00 |
| 10 | 21.50 | 24.50 | 28.00 | 28.50 | 29.00 |

CBA p. 65. ["EFFECTIVE MAY 2014", "2015" and "2017" tables omitted for brevity, while noting that each contains separate rows with rates for Labor Grades 1 through 10, inclusive.]

[Remainder of this page is intentionally blank, to keep following table on one page]

# 111.    SCHEDULE OF JOBS
## CLASSIFIED INTO WAGE GROUPS

| LABOR GRADE | NUMBER | TITLE |
|---|---|---|
| 3 | 725 | Custodian (3/2/1) |
| 4* | 725 | Custodian |
| 5 | 184 | Boxmaker |
|  | 187 | Logistics Specialist (5/4/3/2/1) |
|  | 195 | Production Specialist (5/4/3/2/1) |
|  | 233 | Truck Driver |
|  | 393 | Machine Assembly Operator |
|  | 405 A-B | Mechanic (5/4) |
|  | 727 | Lead Custodian |
|  | 797 | Chemical Storekeeper |
| 6 | 195D | Repair/Inspector |
|  | 202 | Storekeeper (building maintenance) |
|  | 234 | Truck Driver |
|  | 496 | Material Coordinator (6/5) |
|  | 711 | Special Sales Handler |
| 7 | 197 | Lead / Mentor |
|  | 386 | Plastic Mould Operator (7/6/5) |
|  | 394 | Machine Assembly Operator (6/7) |
|  | 407 A-B | Mechanic (7/6) |
| 8 | 171 | Mechanical Inspector (entry level) |
|  | 314 | Heat Treat Operator |
|  | 315 | Quality Auditor |
|  | 378 | Finish Operator (8/7/6) |
|  | 408 A-B | Mechanic |
| 9 | 181 | Maintenance Mechanic |
|  | 333 | Plater (9/8/7) |
|  | 341 | Tech Technician (9/8/7/6) |
|  | 409 A-B | Mechanic |
|  | 707 | Maintenance Apprentice |
|  | 710 | Tele Installation and Maintenance (9/8) |
| 10 | 170 | Senior Test Technician |
|  | 172 | Mechanical Inspector (10/9) |
|  | 221 | Maintenance Machinist (10/9/8) |
|  | 343 | Precision Grind Toolmaker (10/9) |
|  | 410 A-B | Senior Mechanic |

*Denotes red circled

CBA p. 66.

[Remainder of this page is intentionally blank]

* * *

Page 7 of 49

**LETTER OF UNDERSTANDING – MEDICAL SLIDE-IN**

During the 1985-86 negotiations, the parties discussed medical coverage "slide-in" as a job security issue and reached the following understanding:

The COMPANY agrees to maintain retirement medical benefit eligibility for employees laid off at age fifty (50) with ten (10) or more years of service. Such benefit will be the same as had the employee retired from active employment and will become effective upon retirement.

[Remainder of content omitted for brevity]

CBA pp. 73-74 [Added in 1986].

* * *

**LETTER OF UNDERSTANDING – OUTSOURCING DISCUSSIONS**

The COMPANY and the UNION recognized that the job security of all employees can be enhanced by improving the competitiveness and efficiency of the business. For this purpose, the Parties have agreed during recent negotiations to meet and discuss the subject of outsourcing, or other viable alternatives, that will improve the competitiveness of custodial and grounds maintenance work.

CBA p. 80 [Added in 1992].

**LETTER OF UNDERSTANDING – OUTSOURCING NOTIFICATION**

The businesses that form Rockwell Collins and the UNIONS that represent bargaining unit employees within those businesses have jointly agreed to work toward establishing and maintaining a relationship that is based on cooperation, communication and mutual trust. The foundation of this relationship is the recognition that the COMPANY and the UNION are joint partners in the success of the businesses. In order for this relationship to continue to evolve and flourish, both Parties must actively seek opportunities for joint involvement in proactively addressing and resolving the competitive issues that each business will face.

Therefore, in situations where the COMPANY cannot continue to competitively perform work in-house, they will meet with the UNION Business Manager to jointly explore viable alternatives to outsourcing. No work currently being performed in-house by bargaining unit employees will be outsourced unless the COMPANY and UNION Business Manager have met, and the UNION is given every opportunity to have input into

the decision.

The purpose of these discussions will be to present the COMPANY'S needs for its considered action. The UNION Business Manager and the COMPANY will then enter into discussions to jointly determine if there are any opportunities available to the Parties that would preclude the need for this action.

CBA p. 80 [Added in 1995; amended to add "Business Manager" prior to the 2013-2018 CBA].

### Intent to Outsourcing Notification Letter of Understanding

Our existing Letter of Understanding states the COMPANY will "meet with the UNION" when considering outsourcing work from "in-house", because of "competitive issues", in order to "explore viable alternatives to outsourcing." The LOU further stated "no work currently being performed in-house by bargaining unit employees will be outsourced unless the COMPANY and UNION Business Manager have met, and the UNION is given every opportunity to have input in the decision."

The parties agree that the intent of this language was not to interfere with management's right to assign work amongst its many plant locations; management routinely adjusts the flow of work at and amongst it sites to optimize production, employment, and, ultimately, customer satisfaction.

However, in cases where the COMPANY may desire to move an operation or a product line from one of our union plants to one of our non-union sites and the factor driving that decision is higher costs in the represented plant, the COMPANY will meet with the UNION Business Manager first to determine if labor concessions could change that decision.

CBA pp. 80-81 [Added in 2003].

* * *

### LETTER OF UNDERSTANDING – 725 CUSTODIAL JOB SECURITY

Pursuant to discussions between the COMPANY and the UNION during recent negotiations, the following has been agreed to as it pertains to job security of the custodians. Those points agreed upon are:

1.      Eight (8) percent efficiency gain from Custodial Staff.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 9 of 49

2. Focus on identifying underachievers

3. New employees (hired after May 3, 2008) are frozen from movement for twelve months from date of hire.

4. Subcontracted Work (by outside contractors)
   a. Cleaning of Data Centers
   b. Paper recycling process of security bins
   c. Exterior window washing above ground floor.

5. Reestablishment of Custodial Lead Position as Job Code 727 (L/G 5)

6. Transfer of work from JC-181 to JC-725.
   a. Filling Humidifiers
   b. Movement of computers from the Dock
   c. Escort un-badged Contractors
   d. Policing Grounds and clearing snow from entrances
   e. Setting clocks/battery replacement
   f. Vacuum repairs
   g. Replacing stained ceiling tiles, missing ceiling tiles and tiles that are not in place.
   h. Moving excess to docks
   I. Hanging pictures
   j. Cleaning grease filters on cafeteria grills

CBA pp. 106-107 [Added in 2008].

**LETTER OF UNDERSTANDING – 725 CUSTODIAN**

Pursuant to discussions between the COMPANY and the UNION, it has been mutually agreed to change the job classification known as a 725 Utility Custodian, Labor Grade 1/2/3.

1. Employees currently performing custodial work in the 725 job classification will be classified as a Labor Grade 1/2/3
2. The COMPANY agrees to red circle the current fifteen (15) 725 Labor Grade 4 positions. Through attrition, these Labor Grade 4 positions will be replaced with Labor Grade 3 employees. All others will be paid up to the maximum of Labor Grade 3.
3. Qualification for the 725 job code will be seniority only.

For bumping purposes, employees in the 725 job classification will be bumped in order of seniority.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 10 of 49

In the event of a layoff, employees in the 725 job classification will be laid-off in order of seniority.

CBA p. 107 [Added in 2008].

**LETTER OF UNDERSTANDING – 727 LEAD CUSTODIAN LABOR GRADE 5**

Selection: **Selection will be based on the 195 lead selection pro**cess per the proposed 2008 labor agreement with a joint interview (assessment of skill sets based on job responsibilities) by IBEW and RCI management.

**Job Responsibilities:** All job responsibilities, assignments, and tasks will be under the direction of Rockwell Collins management, and in compliance of the IBEW / Rockwell Collins, Inc. labor agreement.

Training: train new and current 725 custodians in cleaning standards and processes in:

- General Cleaning
- Restroom Care
- Floor and Carpet Care
- Clean rooms – perform training according to established clean room procedures
- Special Projects and Tasks (Lamp replacement, Window washing, Pargo Instruction, Recycling)
- Maintaining and Ordering Inventory for RCI buildings in Cedar Rapids.
- Maintain a Training Progress check off list and submit to Rockwell Collins, Inc. management.

**Process Improvement**

- Actively assist management and supervision in improving the quality and efficiency in delivering custodial services to the customer.
- Job shadow to document process flow
- Assist supervision in capturing process flow data and assist in redesigns
- Job share to implement and test process redesign
- Gain and apply knowledge on work loading job assignments
- Participate in evaluating, testing and selecting new equipment

[Remainder of content omitted for brevity]

CBA pp. 108-110 [Added in 2008].

### LETTER OF UNDERSTANDING – CLEANING OWN WORK AREA

Assembly and Test may clean their own work areas. Custodians will continue to clean main aisles in manufacturing areas.

CBA p. 110 [Year added not specified in the record.]

## POSITIONS OF THE PARTIES

The Positions of the Parties follow, abridged from their respective post-hearing briefs. They are set forth single-spaced, `in a different font`, to denote they are *not* the words of the Arbitrator. Footnotes and references may be omitted.

### Union Position

`Overview:` There is no single definitive statement in the CBA of the Employer's rights to subcontract or outsource work. There are several pieces of contract language that could seem to be in conflict or ambiguous. However, the history of bargaining is clear: The parties saw fit to bargain specific language regarding custodians and regarding outsourcing. The contract language and Rockwell's conduct are admissions of a lack of unilateral authority to outsource custodial work.

The Company is violating every piece of contract language which provides work or responsibilities to custodians and lead custodians.

The Company has manifested an obviously incorrect understanding of the 2003 Intent Language which calls into question their judgment and interpretation of the parties' respective rights.

Since the Custodial Job Security LOU specifically states the rights of custodians to work, and the instances in which Rockwell may outsource custodial work, this carves out an exception to the general Outsourcing Notification LOU language.

Similarly, since the Outsourcing Discussions LOU is specifically applied to custodians, for custodians its terms must prevail over general Outsourcing Notification LOU language.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 12 of 49

By itemizing the types of custodial work Rockwell is empowered to outsource, the Company has acknowledged it does not have the unilateral right to outsource custodial work in other situations.

The Union's interpretation gives harmonious and distinct meaning to all relevant contract provisions.

The Company's interpretation renders significant portions of contract language meaningless.

The Company believes it has a minimal meet and confer obligation. Even under this standard, Rockwell has failed to satisfy its obligations.

The use of identical language in three different CBA's demonstrates Rockwell never previously believed the Outsourcing Notification LOU empowered it to unilaterally outsource custodial work.

The 2008 Custodial Job Security LOU is a more recent joint statement of the parties' rights with respect to custodial outsourcing than the 1995 Outsourcing Notification LOU.

The Company's interpretation negates a specific deal struck by the parties and renders it a sham.

By negotiating Custodial Job Security language over the course of 16 months with the Union, by its conduct within those negotiations, and by its conduct prior to contract ratification, Rockwell's actions constitute an admission it does not have the authority to unilaterally outsource all custodial work.

The 2003 Intent Language establishes the Outsourcing Notification language pertains to the movement of work between Rockwell facilities.

Rockwell acted hastily, without institutional knowledge, and with a predetermined outcome in implementing this outsourcing.

<u>Aspects of the 2013-18 CBA are Unambiguous.</u> Rockwell has been in violation of numerous CBA provisions since unilaterally implementing custodial outsourcing. It is undisputed that there are presently no bargaining unit employees doing the work of a 725 custodian or 727 lead custodian. Thus, Rockwell is ignoring significant portions of the Custodial Job Security LOU. Jt. Ex. 1 at 106. Rockwell is also ignoring provisions of the 725 Custodian LOU: it is not presently replacing Labor Grade 4 positions with

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 13 of 49

Labor Grade 3 employees. Id. at 107. Rockwell is ignoring significant provisions of 727 Lead Custodian Labor Grade 5 LOU: it is not complying with the delineated job responsibilities, process improvement responsibilities or other work duty assignments in the LOU. Id. at 108. Rockwell is ignoring the Cleaning own Work Area LOU with its directive that custodians "will continue to clean main aisles in the manufacturing areas. Id. at 110. Finally, Rockwell is not complying with the wage rates for custodians and lead custodians stated in the CBA. Id. at 61-66. These all constitute components of the current collective bargaining agreement Rockwell does not even pretend to follow.

In addition to ignoring the above provisions of the CBA, Rockwell has misstated the understanding of the 2003 intent language. Nancy Wood is simply incorrect when asserting Rockwell does not have to go through a meet and confer process prior to moving work to a non-union facility such as Manchester or Decorah. Trans. at 137. The 2003 Intent Language states precisely the opposite. Jt. Ex. 1 at 81. Wood is an attorney and the Principal Manager of Labor Relations. Trans. at 153. Given Wood's role in the company and the fact that she utilized the Outsourcing Notification LOU and the 2003 Intent Language as the company's "road map" for understanding its obligations vis-à-vis the Union, such a fundamental misunderstanding or misreading of Rockwell's meet and confer obligation casts doubt on the manner Rockwell has chosen to interpret this language.

<u>The Ambiguous Aspects of the 2013-18 CBA Demonstrate Rockwell Collins' Unilateral Custodial Outsourcing Violates the Contract:</u>

<u>The Principle More Specific Provisions Should Restrict the Meaning of a General Provision Supports the Union's Interpretation.</u> Rockwell contends that the Management Rights' clause and the Outsourcing Notification LOU are sufficient justification for unilateral outsourcing. The Union contends that contract language which specifically references custodians is controlling. One rule of contractual interpretation states "more specific provisions should restrict the meaning of a general provision." [FN1: *How Arbitration Works*, 9-41 (Kenneth May ed., 8th ed. 2016)]. The Restatement (Second) of Contracts further states "in case of conflict the specific or exact term is more likely to express the meaning of the parties with respect to the situation than the general language." [FN2: *Id*. at 9-42 (internal citations omitted)]. It is apparent that the Custodial Job Security LOU establishes specific terms for custodians. Furthermore, paragraph four of the Custodial Job Security LOU

delineates the specific types of custodial work Rockwell may outsource. Jt. Ex. 1 at 107. The Outsourcing Notification LOU utilizes comparatively general language. The Union's interpretation is in accord with the principle that specific contract language is more likely to express the parties' intention than general language.

This principle is also relevant when comparing the Outsourcing Notification LOU to the Outsourcing Discussions LOU. The Outsourcing Discussions LOU applies to our situation. The Outsourcing Notification LOU does not. The Outsourcing Discussions LOU is specifically applicable to custodial and maintenance work. Jt. Ex. 1 at 80. The Outsourcing Notification LOU is general. The Outsourcing Notification LOU requires Rockwell to meet with the Union Business Manager and give the Union the opportunity to have input prior to outsourcing. The Outsourcing Discussions LOU only commands the parties meet and confer upon request, but it does not correspondingly contemplate Rockwell may move ahead with outsourcing after meeting with the Union. Trans. at 43; Jt. Ex. 1 at 80. Thus, there is outsourcing language of a general nature and outsourcing language specifically applicable to custodians. The Union's interpretation is in accord with the principle that specific contract language is more likely to express the parties' intention than general language.

The Principle Expressio Unius Est Exclusio Alterius Supports the Union's Interpretation. This principle often leads to the conclusion "contracts that specify certain exceptions imply that there are no other exceptions." [FN3: Id. at 9-40]. The Custodial Job Security LOU specifies certain exceptions for types of work which may be subcontracted to outside contractors by Rockwell. Jt. Ex. 1 at 107. Similarly, the Cleaning Own Work Area LOU specifies an exception as to cleaning work which may be done by employees other than custodians. Id. at 110. In addition to being a valuable tool for interpreting contract language, this principle also simply reflects basic logic. It does not make sense for Rockwell to bargain into the contract specific situations in which they could outsource custodial work if Rockwell actually believed it was empowered to unilaterally outsource all custodial work. The Union's interpretation that the Custodial Job Security LOU controls the question of whether Rockwell may unilaterally outsource custodial work is in accord with the principle the mention of one thing is the exclusion of another.

The principle Giving Effect to All Clauses and Words Supports the Union's Interpretation. A third useful principle of

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 15 of 49

contract interpretation is to give effect to all clauses and
words. This principle also states that an interpretation which
would "render meaningless any part of the contract should be
avoided." [FN4: Id. at 9-36 (internal citations omitted)]. The
Employer's interpretation is inconsistent with this principle.
All of the contract pieces cited by the Union as being ignored by
Rockwell - Custodial Job Security LOU, 725 Custodian LOU, 727
Lead Custodian LOU, etc. - would be rendered meaningless if the
Company is allowed to unilaterally outsource all custodians and
lead custodians. Specifically, the language in the Custodial Job
Security LOU itemizing the occasions in which Rockwell may
subcontract work to outside contractors has absolutely no meaning
under the Employer's interpretation. This principle further
supports a rejection of Rockwell's interpretation.

In contrast, the Union's interpretation does give effect to
the terms of the Outsourcing Notification LOU. The Outsourcing
Notification LOU requires Rockwell to meet and confer with the
Union prior to moving work to a non-union Rockwell facility.
Nothing restricts Rockwell from moving work between or among the
three unionized plants. Rockwell need not meet and confer with
the Union prior to taking such action. The 2003 Intent Language
clarifies the Outsourcing Notification LOU and establishes its
parameters: While Rockwell can freely move work among unionized
plans, it must meet and confer prior to moving work to a
non-union facility.

Moreover, the Outsourcing Discussions LOU gives effect to
all words and clauses by addressing custodians and maintenance
employees. The 2003 Intent Language speaks to moving "an
operation or a product line" to another facility. Custodial and
maintenance work is not work which readily lends itself to being
transferred from one facility to another. Thus, if the
Outsourcing Discussions LOU pertains to custodians and
maintenance, and the Outsourcing Notification LOU pertains to
work which may be shifted among facilities, effect is given to
all words and clauses of the contract language.

This same principle of giving effect to all clauses and
words also establishes that even under Rockwell's interpretation
of the Outsourcing LOU, the company has failed to follow the
Outsourcing Notification LOU. Even under the minimal requirements
Rockwell would acknowledge are within the Outsourcing
Notification LOU, Rockwell has not followed the language: "and
the UNION is given every opportunity to have input into the
decision." Jt. Ex. 1. at 80. Earlier versions of this language
required the Company to meet with the Union and allow the Union
every opportunity for input. Ex. 6; Ex. 7. However, the current

CBA differentiates between "Union" and "Union Business Manager." Jt. Ex. 1 at 80. Where alternative interpretations of contract language are possible, arbitrators typically use the interpretation that gives effect to all words and not the interpretation that would render words meaningless. It is uncontroverted that Rockwell directed the Union Business Manager to refrain from informing union members of potential custodial outsourcing much less giving union members an opportunity for input. Trans. at 24; 170. Conversely, Union members were only informed of their fate after the decision was made, not provided any opportunity to have input into the decision. Ex. E. It is true that Rockwell met with the Union Business Manager, but even the contract language upon which Rockwell bases its case has a greater requirement. The Union cannot be said to have been given every opportunity if Rockwell kept Union members uninformed until after the decision was made.

   The Common Language Utilized Amongst Three Contracts Supports the Union's Position. It is undisputed that in 1995 identical Outsourcing Notification language went into the three different union contracts negotiated with Rockwell. "An even stronger guide is supplied when the same agreement has been entered into by one employer with several unions… In these situations, practice of any of the pairs of parties operating under the agreement may be taken as some indication of the intended meaning of the language used…" As noted, the Coralville bargaining unit never had custodians. The Texas bargaining unit separately and simultaneously agreed to outsource their custodians as they agreed to the Outsourcing Notification LOU. In short, there is no way to interpret the Outsourcing Notification LOU as applying to custodians in Coralville or Texas. On the day the Outsourcing Notification language took effect, anybody could see it had no applicability for custodians in Coralville or Texas. For this reason, when alternative explanations of the Outsourcing Notification LOU in the Cedar Rapids agreement are possible, it makes little sense to assume the parties intended a meaning entirely different from the Coralville or Texas agreements. To claim the Cedar Rapids Outsourcing Notification language applies to custodians makes no sense.

   Other Principles of Contractual Interpretation Support the Union's Position. Arbitrators often construe contracts with consideration to statutes. The Iowa Code states numerous principles of statutory interpretation which are analogous to ordinary rules of contractual interpretation. One statutory Iowa rule of construction states "if the amendments are irreconcilable, the latest in date of enactment by the general assembly prevails." It is undisputed that the Custodial Job

Security LOU entered the contract in 2008 whereas the Outsourcing Notification Language entered the CBA in 1995. Whether interpreting conflicting statutory or contractual language, it is useful to consider the date of agreement. Thus, with respect to the question before the arbitrator - may Rockwell unilaterally outsource all custodial work - the 2008 Custodial Job Security LOU represents the most recent statement of joint agreement.

A separate legal maxim is that the law abhors a forfeiture. Also, arbitrators may take into consideration if one party has attached a meaning to language but not communicated that understanding in negotiations. In negotiating the 2008 Custodial Job Security LOU, the Union made concessions on matters other than subcontracting. The Union made concessions with respect to indentifying underachievers, freezing wages, and achieving greater efficiency from bargaining unit members. Trans. at 49; Jt. Ex 1 at 106-07. Maintenance employees also gave up some of their work jurisdiction. Jt. Ex. 1 at 107. Rockwell's contract interpretation would render these concessions as a sham. If Rockwell believed in 2008 it had the authority to unilaterally outsource all custodial work, these principles dictate that Rockwell had an obligation to make this belief known. Had Rockwell communicated its present interpretation to the Union in 2008, it would make no sense for the Union to agree to these custodial LOU's. From enactment in 2008, bargaining unit members gave up additional wages relying upon the belief the Custodial Job Security LOU and 725 Custodian LOU were parts of a real bargain struck between the parties. An interpretation of the Outsourcing Notification language which nullifies the terms of these custodian LOU's causes a forfeiture and impermissibly allows Rockwell to take advantage of an interpretation of the language it failed to communicate in bargaining.

<u>The Past Practice and Bargaining History Between the Parties Supports the Union's Interpretation:</u>

<u>The Past Practice is to Bargain.</u> Quite simply, the past practice of the parties has been to bargain, generally, and to bargain language specific to custodians in the Cedar Rapids unit. The parties bargained language specifically for custodians and maintenance in 1992. Ex. 5. This 1992 LOU obligated the parties to engage in a discussion of outsourcing, but nothing further. The evidence documents bargaining in 2003 to flesh out the intent of the Outsourcing Notification and bargaining in 2008 to define the parameters of custodial job security. Former Union Business Manager Jerry Vuichard testified "the company always came to the union and said 'We need to negotiate this.' And after both of the sessions in 2003 and in 2008… never did the company walk away

happy. They wanted more." Trans. at 64-65. The practice of the parties has been to bargain contract language with respect to custodians, not to unilaterally implement policies which take away work.

The Bargaining History Demonstrates the 2008 Contract Additions are Controlling. The bargaining history between the parties supports the Union's interpretation that the 2008 Custodial Job Security language is controlling with respect to custodial outsourcing. The parties spent 16 months negotiating the language of the Custodial Job Security LOU. Ex. 13. Rockwell cannot explain why it bargained and crafted an LOU on Custodial Job Security if it believed Rockwell had the authority to unilaterally outsource the work. It can offer no explanation because there is none. Again, its argument is disingenuous. Why would you ask for something you already have? The decision of Rockwell to engage in 16 months of bargaining and come to an agreement on instances in which custodial work may be outsourced constitutes an admission by Rockwell that the company never had the authority to unilaterally outsource custodial work.

The details within the 2006-08 bargaining of the Custodial Job Security LOU further demonstrate Rockwell conceded it did not have the authority to unilaterally outsource custodial work. "Where the meaning of a term is in dispute, it will be deemed, if there is no evidence to the contrary, that the parties intended it to have the same meaning as that given it during the negotiations leading up to the agreement." In an October 3, 2007 document, Rockwell prepared a draft agreement which stated the company "would be allowed to subcontract the following tasks." Ex. 14. This is a further admission. Union witness Vuichard testified that the verb "allowed" is indicative of how Rockwell representatives spoke regarding their bargaining goals. Trans. at 42. This document demonstrates that in 2007 Rockwell did not believe the Outsourcing Notification LOU or management rights clause provided it authority to outsource custodial work. This document further demonstrates Rockwell understood it needed agreement from the union to subcontract custodial work.

Also, Exhibit 15 reflects a shared understanding by the parties as to what they had achieved in bargaining the 2008 Custodial Job Security LOU. Obviously, the Union told its membership "custodial services will be performed by our custodians." Ex. 15 at 1. Critically, Vuichard testified the Exhibit 15 document was created after "we both sat down and agreed on what changes were made during negotiations." Trans. at 68. As to the specific wording of Ex. 15, Vuichard stated "I had them [the company] proofread it." Trans. at 71. Exhibit 15 was

prepared by the Union and given to the Company for them to review prior to being distributed to union members. Trans. at 71-72. If Rockwell believed that the 2008 agreement did not mean "custodial services will continue to be performed by [bargaining unit] custodians," it had an obligation to set the record straight. The acquiescence by the Company to Exhibit 15's characterization of custodial job security demonstrates that Rockwell shared the Union's understanding of the Custodial Job Security LOU.

The record of bargaining in 2006-08 demonstrates that it was not limited to custodial employees, but Rockwell also expressed interest in subcontracting 181 maintenance employee work. On October 1, 2007 Rockwell offered an outline of its proposal on subcontracting maintenance work. Ex. 14. Rockwell made a proposal and there was discussion but no agreement. Trans. at 41. The decision by Rockwell to seek to bargain over subcontracting maintenance work is consistent with an understanding that the Outsourcing Discussions LOU, but not the Outsourcing Notification LOU, applies to maintenance work. Rockwell felt it must negotiate in 2007. A party may not obtain through arbitration what it could not acquire through negotiation. Though in our case Rockwell is not seeking to subcontract 181 maintenance work, the theory of the company's case is the same: management rights and the Outsourcing Notification LOU give it the unilateral right to do so. By making a proposal on subcontracting maintenance employees inconsistent with its present attitude of unilateral authority to make any subcontracting decision deemed necessary, this contradiction again amounts to an admission that Rockwell has never had the sweeping authority to outsource it now claims.

The Bargaining History Demonstrates the Union Has the Correct Understanding of the Outsourcing Notification LOU. The 2003 bargaining notes also support the Union's understanding of the Outsourcing Notification LOU and 2003 Intent Language. Exhibit 19 documents the principles that the Outsourcing Notification LOU provides the Union with input, not veto power, over the decision to move work to a non-union plant. It also states the intent is not to restrict Rockwell from moving work between/among Rockwell sites. Critically, there is no discussion of utilizing this Outsourcing Notification language to bring in outside contractors to do displace bargaining unit employees at a Rockwell facility. The notes simply memorialize an intention to create a process when work needs to be shifted between Rockwell facilities.

The Evidence Demonstrates the Rockwell Acted Hastily to Implement a Preordained Decision. Finally, Rockwell presented no evidence on a past practice or bargaining history. Rockwell

presented no witness who had ever participated in any collective bargaining between the parties. Rockwell does present a picture of a department deemed to be overbudget and tardy in its budgeting. Trans. at 13, 75, 106. Somewhere between the overdue budget submission in October and October 26, Rockwell hastily concocted this scheme to unilaterally outsource custodians. Not only do the conclusions asserted by Rockwell's witnesses stand in direct contrast to the Company's position consistently taken in the past with regard to custodial outsourcing, so does the process. The evidence suggests Rockwell personnel made a rushed decision as an easy way to address a corporate cost-cutting directive.

Moreover, the outcome was preordained: "She indicated that it appeared that under the collective bargaining agreement that that [custodial outsourcing] could be done, the company could make that decision, but that we did need to engage in conversations with the union prior to reaching that decision." Trans. at 112. Rockwell made the decision to outsource and then met with the Union tasking the Union with the burden of lopping off approximately $2.5 million out of a $5.5 million budget. In short, a Rockwell department found itself delinquent, found itself with a self-imposed budget crunch and concocted a legal theory tailored to its short-term needs. Discussions with the union were perfunctory. The Company plowed ahead to unilaterally outsource all custodians with blinders on to prevent the consideration of anything that deviated from achieving this aim.

Conclusion: For all of the above and foregoing reasons, the Union respectfully requests the Arbitrator sustain the grievance, make all affected employees whole for their losses, and retain jurisdiction for such time as needed to effectuate a make-whole remedy.

## Company Position

In December of 2016, after months of discussion and numerous meetings with the Union, the Company followed the Union's instruction to notify employees of the decision to outsource custodial work prior to the holiday shutdown. As demonstrated at the arbitration, the CBA clearly affords the Company the right to do so, and at no point did the Union introduce any viable alternative to outsourcing. [FN1: The Collective Bargaining Agreement ("CBA") does not contain the words "outsourcing" or "subcontracting." Letters of Understanding that are attached to the CBA at pages 80-81, 106-107, and 113-114 use the terms "outsourcing" and "subcontracting" without any distinction. Accordingly, "outsourcing" and "subcontracting" will be used

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 21 of 49

interchangeably in this brief.]

CBA Article I, §3, ¶4 provides that all management of the Company's "*property and operations, and the direction of the working forces, including the right to employ, promote, discipline in the interest of good service, and to discharge employees for proper cause is reserved to the Company, subject however, to such limitations as are contained in this agreement.*"; the CBA contains no language prohibiting outsourcing of Bargaining unit work; the Union never identified any such prohibition; therefore the Company did not violate the CBA.

The Union bears the burden to prove a CBA limitation on the Company's right to outsource the custodial work; the CBA contains no language prohibiting the Company's right to outsource work; the Union did not identify language prohibiting outsourcing of the custodial work during the meetings, nor at arbitration; arbitrators have generally held that management has the right to outsource work unless the contract specifically restricts the right; because there is no specific prohibition in the CBA against the outsourcing of the custodial work, the Company had the right to outsource such work and the grievance should be denied. [FN3: The Union utterly failed to meet its burden of proof on what damages, if any, have been incurred by employees.]

The Letters of Understanding ("Letters") at pages 80-81 and 106-110 do not prohibit outsourcing the custodial work; the Letters do provide that the Company is to "present its needs for the considered action, after which the Company and Union will "enter into discussions to jointly determine if there are any opportunities available to the parties that would preclude the need for this action" CBA at 80; the Company informed the Union that it needed to consider outsourcing the custodial work as part of its effort to maintain its competitive position in the market; specifically, the Company could save approximately $2.5 million on a budget of $5.4 million by outsourcing the custodial work.

In seven (7) meetings beginning in October 2016 and continuing through December 2016, the Parties exchanged numerous documents regarding the decision to outsource the custodial work; the Company repeatedly sought input, ideas, or suggestions for viable alternatives to outsourcing the work but none were offered by the Union; the Company and the Union did not determine any viable option to the need for the outsourcing, but did determine when the announcement of the outsourcing decision should be made and discussed dealing with the effects of the decision; the discussions between the Company and the Union regarding the outsourcing decision demonstrate full compliance with the CBA and

the LOUs; accordingly, the grievance should be denied.

<u>The Letters of Understanding Do Not Prohibit the Outsourcing of the Custodial Work.</u> The Union argued before the joint Labor Relations Board that Letters of Understanding attached to the CBA at pages 80-81 and 106-110 identify the only work that can be outsourced by the Company. None of the Letters expressly prohibit the outsourcing of the custodial work. Further, to the extent the Letters limit to any degree the right of the Company to outsource any work, the Company fully complied with the LOUs; therefore the grievance should be denied.

Wood testified that when she assessed the Company's rights under the CBA to outsource the custodial work, she considered the Letters identified by the U and viewed them in the context of the CBA in its entirety; Wood noted that the Letters dealt with specific situations and were relatively old, having been written over a period of time from 1992 through 2008; Wood testified that the LOU Outsourcing Notification provided that when the Company was considering outsourcing, it would meet with the Union to discuss possible alternatives; the Intent to Outsourcing Notification LOU was intended to clarify that when the Company is transferring work to one of its nonunion locations, there is not an obligation to meet and confer with the U.

Union witness Jerry Vuichard similarly testified that the Letter at Page 106 was written in 2008 to describe the agreement between the Union and Company relating to the outsourcing of three specific pieces of work – cleaning data centers, paper recycling of security bins, and exterior window washing above the ground floor. The Letter at Page 106 contains no language that limits the Company from outsourcing work.

Reading the Letters and CBA together as a whole, Wood recommended that the Company obtain input from the U regarding outsourcing the custodial work before making a final decision; the Company followed Wood's recommendation; Wood's recommendation and the Company's course of action are strongly supported by Paragraph 1 of the CBA effective May 4, 2013:

> The COMPANY agrees to notify the UNION Business Manager of any proposed sale, conveyance, assignment, transfer, consolidation or merger of the COMPANY's operations covered by this Agreement and to provide information about the sale, conveyance assignment, transfer, consolidation or merger, as required by the COMPANY's bargaining obligations under the National Labor Relations Act. Such notification will be at the

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 23 of 49

earliest possible time, consistent with sound business judgment of the COMPANY. [CBA p. 1].

The above language requires the Company only to *notify* and *provide information* to the Union of any proposed assignment or transfer of work; it does not prohibit the assignment, transfer, outsourcing or subcontracting of work; the fact that the above language appears in the CBA between Local 1362 and the Company and is not included in the CBAs between the Company and Local 1634 in Coralville, Iowa indicates that Local 1362 and the Company anticipated the need for outsourcing of work and limited the obligation of the Company to notify and provide information to the Union prior to the outsourcing; Viewing the Letters and CBA together as a whole, the Company fulfilled the requirements of the Letters and CBA by meeting with the Union and obtaining the Union's input prior to deciding to outsource the custodial work.

The Union asks the Arbitrator to read the Letter at Page 106 in isolation and only in part. Reading the Letter in its entirety along with the other Letters of Understanding and the CBA, demonstrates that the intent of the Parties was the Company should notify the Union and gather input from the Union prior to making a decision to outsource the custodial work. The Company fully complied with this intent. For these reasons, the grievance should be denied.

The Letter of Understanding at Page 106 Does Not Prohibit the Outsourcing of the Custodial Work. The Union argued before the joint Labor Relations Board that the LOU at Page 106 identified the only custodial work that can be outsourced by the Company. Nowhere does it state that the specified work is the only custodial work that the Company can ever outsource. If the Union intended the Letter to prohibit all other subcontracting of custodial work, such a clear prohibition should have been written in the Letter. "It is the responsibility of the Union negotiators to express their intentions clearly when restrictions on management's rights are inserted in a collective bargaining agreement." *Federal-Mogul Corp.*, 120 LA 168 (Smith, 2004). Further, when parties list specific items in an agreement, without any more general or inclusive terms, it is assumed the parties intend to exclude from the agreement unlisted items, even though they might be similar to those listed. *See Iowa Meat Processing Co.*, 84 LA 933, 935 (Madden, 1985). Thus, the Letter at 106 does not prohibit the outsourcing of work not specifically listed, and the grievance should be denied.

The Letter of Understanding at Page 107 Does Not Prohibit

the Outsourcing of the Custodial Work. The Union argued before the joint Labor Relations Board that the LOU at Page 107 records a wage concession in exchange for retention of certain work within the bargaining unit. Nowhere does it state that the Company is prohibited from outsourcing any work. In fact, the Letter specifically provides for the possible layoff of Job Classification 725 employees and requires only that such layoff be based on seniority. Because the Letter at Page 107 does not in any way prohibit outsourcing of custodial work, the grievance should be denied.

The Letter of Understanding at Pages 108-110 Does Not Prohibit the Outsourcing of the Custodial Work. The Union argued before the joint Labor Relations Board that Letter of Understanding at Pages 108-110 records specific tasks for a Lead Custodian to facilitate efficiency. Nowhere in the Letter does it state that the Company is prohibited from outsourcing any work. For this reason, the grievance should be denied.

The Letter of Understanding at Pages 80-81 Does Not Prohibit the Outsourcing of the Custodial Work. The Union argued before the joint Labor Relations Board that Letter of Understanding at Pages 80-81 does not apply to this grievance. In the alternative, the Union argues that if the Letter is applicable, the Company did not give "every opportunity" to give input into the decision.

Kaiser, Heppler, Wood and Maloney-Fuller met with Local 1362 a total of seven times and exchanged numerous documents regarding the possible outsourcing of the custodial work. The Union presented no viable option to the outsourcing. Instead, at the November 22 meeting, Tim Horne stated that if the Company was going to proceed to outsource the custodial work, the affected employees should be notified prior to the fast-approaching holiday shutdown. Tr. at 144-45. Wood summarized the November 22 meeting in an email to Parbs and reiterated the Company's understanding that the Union agreed that affected employees should be notified of the decision to outsource the custodial work prior to the holiday shutdown. See Exhibit D. At the arbitration, Parbs stated in rebuttal testimony that she "believed" that Horne meant only that notice to certain construction employees who were about to be laid off should be given prior to the holiday shutdown. Horne, who was available to the Union as a witness and who had participated in all but one of the meetings between the Union and the Company, did not testify. Where a party fails to call as a witness a person who is available to it and who should be in a position to contribute informed testimony, it is appropriate for the Arbitrator to infer that had the witness been called, the testimony adduced would

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 25 of 49

have been adverse to the position of that party. *See Southern Cal. Permanente Med. Group*, 92 La 41, 45 (Richmond, 1989). More importantly, the lack of direct testimony from Horne demonstrates the Union's failure to carry its burden of proof.

The Company continued to invite further discussion and gave the Union notice that if a viable alternative was not presented by December 6, 2016, the Company would make the decision to outsource the custodial work and notify affected employees. The Union presented no evidence demonstrating that they were not given every reasonable opportunity to present alternatives to the outsourcing decision, but apparently argue the "every opportunity" means infinite opportunity. When alternative interpretations of an arguably ambiguous term would lead to a nonsensical, harsh result as opposed to a reasonable result, the Arbitrator should select the reasonable result. *See Hertz Corp.*, 119 LA 1545, 1555-56 (Goldstein, 2004). Here, the Company gave Local 1362 every reasonable opportunity to provide input and present alternatives to the custodial outsourcing as provided by the CBA and Letters of Understanding. For this reason, the grievance should be denied.

<u>The Recognition Clause in Article 1 Section 2 of the CBA Does Not Prohibit Outsourcing the Custodial Work.</u> The Union argued before the joint Labor Relations Board that because the recognition clause in Article 1, Section 2 of the CBA includes "custodial employees," the Company was prohibited from outsourcing the custodial work. It is well settled, however, that recognition language applies to people, not work. *See Cargill Meat Solutions*, 133 LA 1319 (Erbs, 2014); *Libbey Glass*, 116 La 182 (Ruben, 2000) (recognition clause does not bar employer from outsourcing packaging work, because clause may indicate that bargaining unit owns the job, but not that it owns the work). Whether work can be outsourced is a matter of contract. *Cargill Meat Solutions*, 133 LA 1319 (Erbs, 2014). The Parties here have negotiated their specific understanding regarding management of the work. The Management Rights clause reserves to the Company the right to direct its working forces, subject to the limitations contained in the CBA. As set forth above, the limitations included in Paragraph 1 of the CBA and the Letters of Understanding are that the Company meet with the Union, provide information, and allow the Union input into the decision. The Company met seven times with the Union and provided substantial additional information to the Union to allow the Union input into the decision to outsource the custodial work. The Company has fully complied with the CBA and the Letters of Understanding, and the grievance should be denied.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 26 of 49

<u>Conclusion:</u> The Company has acted reasonably and in good
faith with respect to outsourcing the custodial work. The Company
fully complied with the CBA and the Letters of Understanding, and
the grievance should be denied.

## DISCUSSION AND OPINION

Upon careful review of the entire record, it is persuasive that the grievance must

be sustained, for the reasons set forth below.

## RELEVANT FACTS

The following salient facts are not materially in dispute, unless noted otherwise.

They are presented in chronological order where practicable:

In response to declining commercial markets for its products in Fiscal Year

("FY") 2016,[2] the Company sought ways to operate more competitively and efficiently.

As part of this effort, the Company directed that the Cedar Rapids plant's Real Estate

and Facilities Services FY 2017 Annual Operating Plan ("AOP" or "budget") be

substantially reduced. The AOP went through four iterative reviews. This unusually

high number of reviews left the AOP unresolved after the start of Fiscal Year 2017.

Usually the budget is resolved by mid-September, but into October 2016 the budget

remained unresolved. The reviews resulted in the Cedar Rapids Director of Real Estate

and Facilities Services, Bruce Kaiser, being tasked with reducing the FY 2017 capital

budget by $18 million, and the FY 2017 expense budget by $5 million. Even after the

AOP was resolved in October 2016, *how* the budgeted cost savings would be achieved

remained undefined. T105-106.

---

[2]     The Company's fiscal year starts on October 1 and ends on September 30.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 27 of 49

Reviewing the annual expense budget, Kaiser noted two real estate driven items which he acted upon. He divested the Cedar Rapids plant of two relatively expensive building leases, and reduced energy costs, saving approximately $2 million and $800,000, respectively. T77-78.

When reviewing the annual expense budget for other cost savings, Kaiser observed that the cost of custodial work at Cedar Rapids was dramatically higher than any other domestic Company plant. T77-78. He also noted that Cedar Rapids was the only domestic Company plant at which custodial work was performed by Company employees (63 full time equivalents [T80]), rather than contracted out. T78-79.

Kaiser obtained preliminary quotes for custodial services from two vendors, and conducted a comparative analysis. The analysis revealed that the higher cost of custodial work at Cedar Rapids was primarily wage driven (T79), with a wages line of $3.8 million for Company custodial employees at Cedar Rapids, compared to one vendor's proposed wages line of $1.8 million, and the other vendor's proposed wages line of $1.9 million. The vendors' total quotes were $2.7 million and $3.2 million, respectively, compared to the Company's Cedar Rapids FY 2017 (pre-AOP task) custodial staff budget of $5.4 million. T85. Kaiser determined that outsourcing the Cedar Rapids custodial work to a vendor would reduce the annual expense budget by approximately $2.5 million, year over year. T81.

Kaiser had previously tried to increase the competitiveness of Cedar Rapids Company custodial services, such as by setting clear expectations of square foot coverage per employee, implementing progressive discipline for under-achievers,

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 28 of 49

reviving the Lead Custodial position, hiring more Lead positions to provide oversight and guidance, and to ensure quality of work, and operating with a smaller custodial staff than budgeted.

These were among the items extensively bargained by the parties from 2006 to 2008 regarding the competitiveness of Cedar Rapids Company custodial services, including custodial employee productivity and job security. The negotiations culminated in the addition of three new Letters of Understanding to the 2008-2013 CBA: 725 Custodial Job Security, 725 Custodian, and 727 Lead Custodian Labor Grade 5. Included in the new LOUs were substantial Union wage concessions (T26-27; T49), the transfer of ten (10) items of work from higher-wage-rate maintenance bargaining unit employees to lower-wage-rate custodial bargaining unit employees, the reestablishment of the Custodial Lead position, and the subcontracting of three specific types of custodial work to outside contractors. However, in October 2016, Kaiser determined that Cedar Rapids custodial services were still insufficiently competitive, and still not yielding the cost savings needed by the Company going into the next year. T80-81.

In October 2016 Kaiser contacted Principal Human Resources Partner for Operations, Dwaine Heppler, regarding outsourcing the custodial work in Cedar Rapids to help meet the cost challenges of the FY 2017 AOP task. Heppler informed Kaiser that the custodial positions are covered by the CBA.

In October 2016, shortly after Heppler informed Kaiser that the custodial positions are covered by the CBA, Heppler contacted Principal Manager of Labor

Relations, Nancy Wood. Heppler informed Wood of the underlying competitive environment and challenging FY 2017 facing the Company, the need for Operations to help the Company be competitive, and that Kaiser had come forward asking if it would be possible to outsource the Cedar Rapids custodial work. Wood reviewed the CBA and informed Heppler that the custodial work could be outsourced, but the Company would need to engage in conversations with the Union prior to reaching the decision to outsource, and provide the Union with the opportunity to provide alternatives to outsourcing.

On October 25, 2016 Heppler and Wood telephoned IBEW District 11 Representative Tad Gusta. Heppler and Wood *"shared with Mr. Gusta that the company was looking at a number of alternatives. We shared the competitive environment the company was in and some of the budgetary constraints we were looking at for FY '17 and that the company was looking at the possibility of outsourcing custodial work in Cedar Rapids."* T113. Gusta responded that, *". . . clearly we need to take a look at was that something that was possible under the collective bargaining agreement, that we need to engage in conversations with the union, you know, and he suggested that, you know, he would encourage the Local 1362 leadership to keep an open mind in conversations with the company."* T113-114; T139.

Later the same day (October 25, 2016), Kaiser, Heppler and Wood met with Union Business Agent Shelley Parbs, and Assistant Business Agent Tim Horn.[3]  Similar

---

[3]     Tim "Horn" and Tim "Horne" appear interchangeably in the record. Both spellings refer to the same Union Assistant Business Agent.

meetings took place on November 4, 18, 22 and 28, and December 1, 2016. At the

behest of the Company, the parties discussed the declining market situation, the

Company's fiscal challenges, the need to improve competitiveness, and the possibility

of outsourcing custodial work to improve competitiveness. They also discussed other

potential cost saving ideas (such as cost of supplies, productivity, temporary layoffs,

voluntary layoffs, reduced hours and early retirements), and the potential costs and

effects of outsourcing (such as training, recertification, bumping, medical slide-in, *etc*.),

and the components of the vendor quotes. The parties also corresponded between

meeting dates.

On December 5, 2016, in an email from Wood to Parbs, the Company:

*provide[d] an overview of communications with the Union to-date regarding excess and potential outsourcing issues related to the employees represented by IBEW Local 1362 that have occurred from October through December. While it is not inclusive of each and every conversation or communication, the following timeline reflects the ongoing dialogue in which the parties have engaged:*

[timeline omitted]

*In sum, Rockwell Collins has met and conferred with Local 1362 in excess of seven times to discuss these issues. We have appreciated the input and dialogue, but no proposals have been made that suggest a savings remotely near to that which can be achieved through custodial outsourcing. It warrants reiterating that Cedar Rapids is the only domestic Rockwell Collins location where custodial work is not currently outsourced. Absent any proposals received by the end of the day today that warrant additional consideration, Rockwell Collins will proceed with employee notification.*

XCD.[4]

---

[4]     Exhibit numbers (Union) and exhibit letters (Company) are prefixed with "XJ", "XU", or "XC", for Joint, Union or Company exhibits, respectively.

Later, also on December 5, 2016, Kaiser made the decision to outsource all Cedar Rapids custodial work. The decision was disclosed to the Union the next day, December 6. T102-103.

Also on December 6, 2016 the Union emailed the Company regarding the Company's alleged failure to provide sufficient information to the Union. The Union's email noted in particular that on November 18 the Union requested that the Company provide the potential custodial services suppliers' names, but the Company denied the request on November 22, and that on November 30 the Union had again requested their names, as well as their written bid proposals. On December 6, shortly after the Union's email, the Company revealed the names of the two potential suppliers. The Company held all-hands meetings at 4:15 PM and 10:45 PM to announce the decision to employees.[5] T103; XCE.

On December 7, 2016, the Union issued "Request for Adjustment" No. 009913 ("Grievance"). The Grievance stated:

> On December 6, 2016, Rockwell Collins management announced the intention to subcontract all of the custodial work/duties and therefore displacing Job Code 725 and 727, at all of the facilities in Cedar Rapids, Iowa. The Union believes that this action is in violation of Paragraph 3, Paragraphs 109-111, Letters of Unstanding regarding Outsourcing, and all other applicable contract provisions in the Collective Bargaining Agreement between the Company and IBEW Local 1362. We ask that this action stop and our members be made whole.
>
> XJ2.

---

[5]     The Company states that *"[t]o be factually accurate, [it] announced the decision on December 6th pursuant to the Union's instruction, but employees remained employed until February 24, 2017."* Company Brief 3.

On December 8, 2016 the Union expounded upon the grievance language, at Company request, stating in pertinent part (Parbs to Wood email):

> I understand, from our conversation in the meeting @8:00 am on December 8, 2016, that you would like our grievance to be more specific. I would be happy to amend our grievance to include: Paragraph 3, Paragraphs 109-111, Letters of Understanding regarding Outsourcing, Letters of Understanding regarding Custodians, and all other applicable contract provisions. Certainly, we believe that is already a part of the current grievance as it falls under "all applicable contract provisions." Do you have any issue with us amending the grievance?
>
> Otherwise, we could simply file a second grievance alleging a violation of Letters of Understanding regarding Custodians.

XCF.

On December 14, 2016 the Company issued a denial of the grievance, stating:

> The grievance is denied. Since October of 2016, Rockwell Collins has discussed the possibility of custodial work being performed by a third party, following the procedure required by the collective bargaining agreement. The Company has adhered to the obligations dictated by the collective bargaining agreement in a consistent manner.
>
> In addition, Rockwell Collins renews the request delivered verbally on December 13th 2016 for copies of any and all documents and/or information which IBEW Local 1362 maintains support its position with respect to the above-referenced grievance.

XJ3.

On December 15, 2016 the parties presented the dispute to their joint Labor Relations Board. XJ4, XJ5. The Board deadlocked, and the Union served notice, dated December 15, 2016, for appeal to arbitration of its Request for Adjustment. XJ6.

On December 22, 2016, the Company provided the Union with the name of the supplier it selected to perform custodial services at the Cedar Rapids facilities. XCG.

Also on December 22, 2016, the Company issued a formal WARN Notification to

the Union. The Notification stated, in pertinent part: "*Employment separations in connection with the proposed layoffs are expected to commence on or about February 24, 2017, and be completed within a 14-day period thereafter. This action is expected to be permanent. A list of job titles and the names of employees currently holding those positions accompanies this letter.*" XCH.[6]

In February 2017, the undersigned was selected as Arbitrator by the parties, and appointed by FMCS.

<u>ANALYSIS</u>

The Union bears the burden of proof in this contract interpretation grievance. For the reasons that follow, the Union has met its burden.

Under the facts and circumstances of this record, the Union's argument that the Company's action violated unambiguous provisions of the CBA is persuasive. In light of these provisions, the Company's arguments in support of its action are not persuasive.

It is the parties' practice to negotiate Letters of Understanding ("LOU"s or "Letters")[7] which are appended to, and part of, the CBA. The 1992 "Letter of

---

[6]     The Company posits that of the 62 impacted employees, "*At the time of the arbitration, approximately 70% of the employees affected by the decision were no longer on layoff status. Tr. At 174-76.*" Company Brief 22, and that: "*Of the 62 impacted employees, 26 remain employed at Rockwell Collins and did not experience a loss of pay or benefits; two are on medical leave; eight retired and two were terminated from employment for reasons unrelated to the outsourcing; 24 remain on layoff status.*" T14; XCI. Prior to the outsourcing, the Union represented slightly more than 1,000 bargaining unit members. T16.

[7]     Individually, they are titled "Letter of Understanding" (except for one: "Letter of Agreement – Anti-Drug and Alcohol Abuse Program". XJ1 p. 76). However, In the CBA Index, they are grouped under the heading "Letters of Agreement". XJ1 pp.

Understanding – Outsourcing Discussions" ("1992 LOU Outsourcing Discussions") deals specifically, and only, with custodial and ground maintenance work. It obligates the parties to "*meet and discuss the subject of outsourcing, or other viable alternatives, that will improve the competitiveness of **custodial** and grounds maintenance work.*" [Emphasis added].[8]

Therefore, the Company's reliance on the above CBA ¶1, page 1 *general* notify-and-provide-information provision is not persuasive in light of the 1992 LOU Outsourcing Discussions applying *specifically* to outsourcing *custodial* work at Cedar Rapids.

1995 Letter of Understanding – Outsourcing Notification

Regarding the Company's reliance on the 1995 "Letter of Understanding – Outsourcing Notification" ("1995 LOU Outsourcing Notification"), T136-137, it is also the parties' practice, though seldomly, to negotiate "Intents" to LOUs. The undisputed purpose of an "Intent" to an LOU is to clarify the parties' intent regarding the particular LOU. T64. This was demonstrated in 2003, when the parties added "Intent to Outsourcing Notification Letter of Understanding" ("2003 Intent to 1995 LOU Outsourcing Notification"). The Intent begins on CBA page 80, immediately following the 1995 LOU Outsourcing Notification, the sole LOU to which it applies. XJ1.

_____

121-122. In this proceeding the parties refer to them as Letter(s) of Understanding, Letters, or LOU(s). It is a difference without a distinction in this proceeding.

[8] For brevity, the "maintenance" component of the 1992 LOU Outsourcing Discussions will be omitted hereinafter.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 35 of 49

Intents, like LOUs, are appended to, and part of, the CBA. The LOUs and Intents are on numbered CBA pages, and are listed in the CBA Table of Contents. The LOUs and Intents occupy pages 72 to 118 of the 133 page 2013-2018 CBA.[9] The LOUs and Intents are part and parcel of the CBA.

The 2013-2018 CBA Index lists 66 Letters of Agreement (*i.e.*, LOUs). The 2013-2018 CBA Index lists two Intents, one of which is relevant to this grievance: "Intent to Outsourcing Notification Letter - [page] 80". XJ1 p. 121.[10] In other words, in 2003 the parties utilized the relatively rare Intent device to negotiate into the CBA a clarification of their mutual intent regarding the 1995 LOU Outsourcing Notification. Because the 2003 Intent explicitly applies to the 1995 LOU Outsourcing Notification, they must be read together and in this context.

The 2003 Intent consists of three paragraphs. The first paragraph summarizes the agreed upon course of action embodied in the 1995 LOU Outsourcing Notification. The second paragraph states the parties' agreement that the 1995 LOU Outsourcing Notification was not intended to interfere with the Company's right to assign work amongst the Company's many plants, recognizing that "management routinely adjusts the flow of work at and amongst [its] sites to optimize production, employment, and, ultimately, customer satisfaction." The third paragraph sets forth the parties' intent

---

[9] CBA pages 119 to 133 consist of the Index; pages 127-133 consist of generic calendars from January 2013 to December 2018. There is no page 126. XJ1.

[10] The other Intent applies to "Letter of Understanding – Test Technician Progression/Training", which is not relevant to this grievance.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 36 of 49

that the 1995 LOU Outsourcing Notification applies to situations satisfying three (3) necessary conditions: First, the Company's "desire to move an operation or a product line". Second, that the move is "from one of our union plants to one of our non-union sites". And, third, that "the factor driving that decision is higher costs in the represented plant".

The record establishes that only the third of the three necessary conditions was met in this case, *i.e.*, the factor driving the Company's decision was higher [custodial] costs in the represented plant. Additionally, in this context, the parties did not intend the phrase "an operation or a product line" to include custodial work. Custodial work is by its nature work involving the care and cleaning of buildings and related facilities. This is illustrated by the "Proposed Facilities Services Housekeeping Efficiencies and Annual Savings" document contained in XU14. It refers to custodial work *to be performed at particular Company buildings in Cedar Rapids*. For example: ". . . collection/ distribution of Security Bins *within all Rockwell Collins buildings*. . . exterior glass cleaning *above first floor of Buildings 109, 124, 126, 153, 184* and Cat Walk *between Buildings 108 and 109*." [*Italics* added].

Thus, it is apparent in this context that custodial work is not a "product line". Whether or not one classifies custodial work as an "operation", the record establishes that this was not a decision involving the necessary condition of the Company's "*desire . . . to move* [the work] . . . *from one of our union plants to one of our non-union sites*". There is nothing in the record to suggest that the buildings and related facilities involved in this grievance are moveable "operation[s]" or "product line[s]"

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 37 of 49

contemplated by the parties in the 1995 LOU Outsourcing Notification and 2003 Intent to 1995 LOU Outsourcing Notification.

Therefore, the record persuasively demonstrates the plain meaning of the 2003 Intent to 1995 LOU Outsourcing Notification to be that the 1995 LOU Outsourcing Notification does not apply to the Company's action which is at issue in this grievance.

Consequently, the 1995 LOU Outsourcing Notification provision for *"discussions to jointly determine if there are any opportunities available to the Parties that would preclude the need for this action"* does not apply to the Company's action which is at issue in this grievance.

Additionally, the 1992 LOU Outsourcing Discussions, specifically applicable to custodial work, is not nullified by the 1995 LOU Outsourcing Notification. The parties are sophisticated, with several decades of CBAs between them, since 1943. If they intended the generally applicable 1995 LOU to supersede the custodial-specific 1992 LOU, they could have said so in the 1995 LOU. Alternatively, they could have excised the 1992 LOU from the CBA. The parties did neither, though they were aware of the existence of both. It also bears mention that in the 1998-2003 CBA, page 109 consists entirely of the 1992 LOU Outsourcing Discussions, immediately followed by the 1995 LOU Outsourcing Notification. And, in the 2003-2008 CBA, the 1992 LOU Outsourcing Discussions occupies the bottom of page 82, again immediately followed by the 1995 LOU Outsourcing Notification at the top of page 83.[11] Yet again, in the 2013-2018

---

[11]    The record contains only a partial 2008-2013 CBA; it does not include the pages containing these two LOUs. XU9.

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 38 of 49

CBA, the 1992 LOU Outsourcing Discussions is immediately followed by the 1995 LOU Outsourcing Notification, manifesting the parties' intent that the 1992 LOU Outsourcing Discussions remains in effect with respect to outsourcing custodial work.

Similarly, the continued existence of the 1992 LOU Outsourcing Discussions, which specifically addresses custodial work, indicates the parties' intent that it takes precedence over the generally-applicable provisions of ¶1 on CBA page 1, as discussed above.

<u>CBA Wage Provisions</u>

CBA Paragraphs 109-111 contain the parties' negotiated Schedule of Wage Rates, and Schedule of Jobs Classified Into Wage Groups. They are unambiguous provisions of the CBA. The Union's grievance cites the Company's decision *"to subcontract all of the custodial work/duties and therefore displacing Job Code 725 and 727, at all of the facilities in Cedar Rapids, Iowa. The Union believes that this action is in violation of . . . Paragraphs 109-111, . . ."*. Under the facts and circumstances of this record, this is a persuasive argument.

Paragraph 109 is the "Schedule of Wage Rates for Employees Hired Prior to 5/4/2013". It consists of four charts, each effective in May of 2014, 2015, 2016 and 2017, respectively. The "Effective May 2016" chart is reproduced above. Each chart contains 10 rows of wage rates, one each for Labor Grades 1 through 10. Each chart contains five columns of wage rates for each Labor Grade row: Base Rate; After 13 Weeks; After 26 Weeks; After 39 Weeks; and After 52 Weeks.

Paragraph 110-A is the "Alternate Rate Structure (ARS)". It embodies the

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 39 of 49

parties' agreement on "flexibility in starting wages for new hires depending on the hiring environment." It is not necessary to discuss the details of the flexibility agreement, other than to note that Paragraph 110-A contains four charts, each effective in May of 2014, 2015, 2016 and 2017, respectively. Each chart contains 10 rows of wage rates, one each for Job Grades 1 through 10. Each chart contains five columns of wage rates for each Labor Grade row: Base; 13 Weeks; 26 Weeks; 39 Weeks; and 52 Weeks.

Paragraph 110-B is the "Pay Scale for Employees Hired After 5/4/2013". It, too, consists of four charts, each effective in May of 2014, 2015, 2016 and 2017, respectively. The "Effective May 2016" chart is reproduced above. Each chart contains 10 rows of wage rates, one each for Labor Grades 1 through 10. Each chart contains five columns of wage rates for each Labor Grade row: Base Rate; After 6 Months; After 12 Months; After 18 Months; and After 24 Months.

Paragraph 111 is the "Schedule of Jobs Classified Into Wage Groups". It consists of a single chart (reproduced above) with three columns: Labor Grade; Number [*i.e.*, Job Classification Number]; and Title [*i.e.*, Job Title]. The Labor Grade column contains eight rows, for Labor Grades 3 through 10. The Number column contains 35 rows, 33 of which are subdivisions of the Labor Grade column rows for Labor Grades 5 through 10. For example, the Labor Grade 5 row is subdivided into eight rows of distinct Job Classification Numbers and Job Titles, one of which is 727, Lead Custodian.

The Labor Grade 3 and Labor Grade 4 rows are not subdivided. The sole Job

Classification on the Labor Grade 3 row is 725, "Custodian (3/2/1)". The sole Job Classification on the Labor Grade 4 row is 725, "Custodian". Labor Grade 4 is red circled. The two lowest Labor Grade tiers in Paragraph 111 are comprised of Custodians. Lead Custodians, 727, are in subdivided Labor Grade 5. There are no other custodial titles in the chart. The Company's action unilaterally eliminated all of these.

The above undermines the integrity of the parties' unambiguous wage bargain, and also is inconsistent with the plain meaning of the mutual understandings set forth therein. Accordingly, it effectively frustrates a basic purpose of the CBA.

In this regard, the 2008 Custodial LOUs show that when the parties intended to alter their wage bargain, they did so by agreement, not unilaterally. For example, paragraph "3" of the 2008 LOU 725 Custodial Job Security states: "New employees (hired after May 3, 2008) are frozen from movement for twelve months from date of hire." Paragraph "5" of the same LOU states: "Reestablishment of Custodial Lead Position as Job Code 727 (L/G 5)". The 2008 LOU 725 Custodian states: "It has been mutually agreed to change the job classification known as a 725 Utility Custodian, Labor Grade 1/2/3." It continues: "1. Employees currently performing custodial work in the 725 job classification will be classified as a Labor Grade 1/2/3.; 2. The Company agrees to red circle the current fifteen (15) 725 Labor Grade 4 positions. Through attrition, these Labor Grade 4 positions will be replaced with Labor Grade 3 employees. All others will be paid up to the maximum of Labor Grade 3."

The 2008 LOU 725 Custodial Job Security, and 2008 LOU 725 Custodian, both specifically include substantial Union wage concessions. T26-27; T49. The Company's

action unilaterally undermines the integrity of the parties' unambiguous mutual agreements on wage changes contained therein, and also is inconsistent with the plain meaning of the mutual understandings set forth therein. Accordingly, it effectively frustrates a basic purpose of the CBA's 2008 Custodial LOUs.

Furthermore, the Company's unilateral action permanently eliminated all 725 and 727 custodial positions, resulting in permanent layoffs. T173-177; XCH. At the same time, the custodial work did not *move* at all. The custodial work did not *change* at all. Rather, the same custodial work is being performed on-premises at the same Cedar Rapids plant, is being performed by essentially the same number of subcontractor workers (T85-86; T119-120), at lower wage rates, while causing loss of bargaining unit employment. On the record presented, this violates the CBA wage provisions of Paragraphs 109-111 and the 2008 Custodial LOUs, without a sufficient business justification.

Thus, it is persuasive that this is not a situation where the Company's action was motivated by improved methods of operation, new machinery or technological change. Instead, the Company's action was admittedly driven by custodial labor cost, albeit for the valid purposes of Company competitiveness, particularly in a down market for its products. T77-80; T85-86. As stated by the Company to the Union on December 5, 2016: "*The projected savings is not a function of either square footage or the number of custodial staff. As previously explained, it is a function of the wages, taxes, insurance and benefits that factor into the equation.*" XCC.

Maintaining or increasing the Company's competitiveness is undisputedly a valid

business priority. However, on this record, if the Company were free to avoid or unilaterally dismantle its collectively bargained wage obligations on the basis of labor cost savings alone, such fundamental contractual provisions would be rendered meaningless.

The CBA Rights of Management Reserved provision reserves to the Company the right to manage its "*property and operations, and the direction of the working forces . . . subject however, to such limitations as are contained in this agreement.*" CBA Article I, §3, ¶4. The wage provisions of CBA Paragraphs 109-111, and the 2008 Custodial LOUs, are "*such limitations as are contained in this agreement.*" The Company's action exceeded these limitations. Therefore, the Company's action was in violation of the CBA.

Union Acquiescence/Consent to the Outsourcing

The Company characterizes Tim Horn's November 22 statement regarding employee notifications as a "directive", and asserts that "*Horne's directive signaled that the Union was not contesting the decision to outsource the custodial work and was moving forward to discuss the effects of the decision. Tr. At 144.*" Company Brief 18. However, this is not persuasive.

Horn's statement was **conditional:** "*Tim Horn stated that __IF__ this was the path that we were going down, we need to make – we needed to put employees on notice as soon as possible because they needed to know prior to holiday shutdown so they could plan accordingly.* T144 [Emphasis added].

Moreover, at the November 22 meeting, the Company agreed with the substance of Horn's statement. Dwaine Heppler of HR testified that in response to it, "*Yes, I*

*agreed . . . as soon as the decision would be made, we would want to inform the workforce*

*as soon as possible . . .".* T121; T96-97. In summarizing the subsequent December 1

meeting, the Company wrote to the Union that "*Rockwell Collins also indicated that any*

*other proposals would need to be received by the end of the day on December 5, 2016. This*

*is due to time constraints and the **acknowledgement by both parties that employees need***

***to have information as soon as possible**.*" XCD [Emphasis added].

Thus, both parties reasonably agreed at the November 22 meeting that once a

decision was made, it should be communicated to employees as soon as possible. On

the record presented, even if Horn was referring to all employees (not just

construction/apprentices), this does not lead to the conclusion that Horn's November

22 statement constituted either a directive, or a signal that the Union was not

contesting the decision to outsource the custodial work – a decision that the Company

maintains was not made until December.

Additionally, Wood testified that the purpose of the email she sent to Parbs on

December 5, 2016 was:

> *To summarize the course of the discussions between the parties since there had*
> *been a lot -- there had been a lot of meetings and there had been a lot of*
> *information going both ways, and I wanted to make sure we were on the same*
> *page. We also wanted to reiterate, again, any other -- if there was going to be*
> *a time for any other possible proposals, that was the time. And that's what's*
> *found in the final paragraph of Company Exhibit D.*

T149.

In her December 6 email reply to Wood, Parbs wrote: "***IBEW Local 1362 does***

***not believe the company has the right to sub-contract or outsource custodial***

**employees.** *Additionally, IBEW Local 1362 does not believe the company has, to date, provided all the information required of it to the Union.*" XCE [Emphasis added]; T125-126; T149-150. The Union filed its grievance the next day. This is consistent with Parbs' credible testimony she never told the Company that "she was fine with them outsourcing these jobs." T25-26.

Also, at the outset, IBEW District 11 Representative Gusta's reaction, upon being informed on October 25 of potential outsourcing, was to question whether it was possible under the CBA. T113-114. His response about the need to engage in conversations and keep an open mind was consistent with the parties' joint obligation to discuss custodial outsourcing, per the 1992 LOU Outsourcing Discussions.

Therefore, under the facts and circumstances of this record, the Union cannot be said to have agreed, acquiesced or consented to the outsourcing of all custodial work at Cedar Rapids.

Other Company Plant CBAs

The affirmative answer to the issue before this Arbitrator has been drawn solely from the plain meaning of the terms found within the four corners of the CBA. Thus, there is no absolute necessity to consider extrinsic evidence.

However, the Union offered evidence at the hearing of CBAs from other Company plants and Unions, to which the Company objected. The exhibits were admitted into the record, with the parties given the opportunity, both at the hearing and in post-hearing submissions, to argue the relevance and weight of these external CBAs. The parties did so. Though not dispositive to the outcome of this grievance, the

Coralville, Iowa and Collin County, Texas CBAs merit brief discussion.

<u>Coralville, Iowa Plant</u>

Regarding the Cedar Rapids CBA, ¶1, page 1, the Company points out that there is no such provision in the Coralville CBA between the Company and IBEW Local 1634. Thus, argues the Company, this provision indicates that at Cedar Rapids the Company and IBEW Local 1362 "*anticipated the need for outsourcing of work and limited the obligation of the Company to notify and provide information to the Union prior to the outsourcing*". Company Brief 26-27. However, this is not persuasive.

It is undisputed that the Coralville bargaining unit has never included Custodians (or Janitors). The Coralville CBA does have the identical 1995 LOU Outsourcing Notification as the Cedar Rapids CBA in this proceeding, but not the 1992 LOU Outsourcing Discussions. This highlights the general applicability of the 1995 LOU Outsourcing Notification, compared to the custodial-specific applicability of the Cedar Rapids 1992 LOU Outsourcing Discussions.

Moreover, the Coralville CBA shows that the subcontracting of *all maintenance* work was mutually agreed upon, not unilateral. It contains an LOU stating:

> Pursuant to discussions during negotiations leading to this Agreement, the Parties understand all facilities and maintenance, new construction work and existing facilities maintenance work will be subcontracted to an appropriate type contract business. Examples would be (not all inclusive) routine building/systems maintenance, snow removal, electrical, etc. The Parties also understand service/support type functions will also be contracted out; such as plant security, lire plant care, etc.
>
> XU10, XU11.

<u>Collin County, Texas Plant</u>

While noting that the Collin County, Texas plant CBA is with the IUE-CWA, not the IBEW, the IUE-CWA CBA with Rockwell Collins contains the identical Management Rights Reservation provision, identical 1992 LOU Outsourcing Discussions, and identical 1995 LOU Outsourcing Notification as the Cedar Rapids CBA in this grievance. XU16, XU17, XU18.

Similarly to the Coralville CBA, the Collin County CBA shows that the outsourcing of *all janitorial* work was mutually agreed upon, not unilateral. It contains a 1995 "Letter of Agreement, Janitorial Work" stating:

> The company will outsource all janitorial work required to service the bargaining unit area. Employees assigned to janitorial positions 306 and 371 as of May 1, 1995, will be reassigned to Assembly in the 331 job code. Job code 306 incumbents will be red circled at labor grade 3 pay for the term of the current CBA.

> If a bargaining unit reduction in force reduces the number of bargaining unit employees below the bargaining unit headcount level in effect on May 1, 1995, the company will repost job code 306 and job code 371 positions up to a maximum of five positions, as required to service the bargaining unit area.

> XU18.

## CONCLUSION

Based upon all of the foregoing, it is not necessary to address the parties' remaining contentions. In conclusion, based upon thorough review of the entire record, the Union met its burden to prove that the Company's action violated the CBA. The Company did have a valid business priority to lower costs in order to maintain or increase its competitiveness, particularly in a down market for its products. However,

Case 1:18-cv-00082-KEM   Document 1-3   Filed 08/10/18   Page 47 of 49

the record establishes that the Company did not have a sufficient business justification to outsource all Cedar Rapids custodial work in contravention of the limitations contained in the parties' CBA. Therefore, the Union's grievance must be sustained.

## **<u>REMEDY</u>**

At the hearing the parties requested that if the grievance is sustained, the Arbitrator retain jurisdiction while giving the parties the opportunity to negotiate a mutually agreeable remedy. Accordingly, the Arbitrator will retain jurisdiction over the issue of remedy, and temporarily remand to the parties for the opportunity to negotiate a mutually agreeable remedy, as set forth in the Award.

Accordingly, and based upon all of the above, the following Award is issued:

[Remainder of this page is intentionally blank]

## AWARD

**The Company violated the Collective Bargaining Agreement when it unilaterally outsourced Custodians [Classification 725] and Lead Custodians [Classification 727] on or about December 6, 2016.**

**Therefore, the grievance is sustained.**

**Per joint request of the parties, the Arbitrator retains jurisdiction over the issue of remedy. Per joint request of the parties, the issue of remedy is temporarily remanded to the parties for the opportunity to negotiate a mutually agreeable remedy.**

**Accordingly, the parties are hereby directed to promptly engage in good-faith remedy negotiations. On or before sixty (60) days after the date below, the parties will jointly inform the Arbitrator of their mutually agreed upon remedy, for inclusion in a Supplemental Award, or, of their joint request for additional time to negotiate a mutually agreeable remedy. In the absence of such mutually agreed upon remedy, or such joint request, the Arbitrator will address the issue of remedy.**

Dated: July 18, 2018                Robert A. Grey, Arbitrator

## AFFIRMATION

I hereby affirm that I executed this instrument as my Opinion and Award.

Dated: July 18, 2018                Robert A. Grey, Arbitrator